**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GURMEET S. SAGGU**, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 19 C 2303** |
| | ) | |
| **LOUIS DEJOY, Postmaster General** | ) | **Judge Rebecca R. Pallmeyer** |
| **of the United States Postal Service,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Gurmeet S. Saggu ("Plaintiff"), an employee of the United States Postal Service, brings this suit against Louis DeJoy,[1] Postmaster General of the United States Postal Service ("Defendant"), for various forms of employment discrimination. Plaintiff alleges that Defendant discriminated against him on the bases of his race, gender, religion, national origin, and age, and retaliated against him for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"). Defendant has moved for summary judgment. For the reasons provided below, the motion is granted.

## BACKGROUND

Plaintiff Gurmeet Saggu works as a supervisor of distribution operations at the U.S. Postal Service's processing and distribution center in Carol Stream, Illinois. (Def.'s L.R. 56.1 Statement of Facts [30] (hereinafter "Def.'s SOF") ¶ 1.) He has worked for the Postal Service since 1997 and at the Carol Stream facility since 1998. (Pl.'s L.R. 56.1 Statement of Additional Facts [37] (hereinafter "Pl.'s SOF") ¶¶ 1,5.) Saggu is male, Asian, of Indian origin, Sikh, and was born in

---

[1] When Plaintiff filed this lawsuit, Megan J. Brennan was Postmaster General. Louis DeJoy was sworn in as Postmaster General in June 2020. Pursuant to FED. R. CIV. P. 25(d), DeJoy is substituted as Defendant.

1959. His direct supervisor is the manager of distribution operations. (Def.'s SOF ¶ 1.) From approximately August 2016 through 2018, the manager of distribution operations for Saggu's shift was Bernadette Binkley, a Black woman. (*Id*. ¶ 2.) Plaintiff alleges that Binkley discriminated and retaliated against him because of his race, gender, religion, national origin, and age, and created a hostile work environment. (*Id*.)

## I. Alleged Discrimination and Retaliation by Binkley

As described here, Plaintiff claims Binkley discriminated against him in a number of ways, including denial of leave to which he was entitled; criticism of his job performance; "micromanaging" him; depriving him of overtime opportunities; and denying promotion and training opportunities.

In June of 2017, Plaintiff asked Binkley for two weeks of leave so that he could travel to India to take care of his mother, who had cancer and was undergoing surgery. (*Id*. ¶ 3.) Binkley allegedly denied the request, so Plaintiff contacted the Human Resources unit and applied for Family Medical Leave Act ("FMLA") leave. (*Id*. ¶¶ 3–4.) While his FMLA request was pending, Plaintiff went to India, and was recorded in the Postal Service's online timekeeping system as having taken 80 hours of "FMLA sick leave." (*Id*. ¶ 4.) Binkley changed Plaintiff's timekeeping entry to FMLA leave-without-pay status, however, purportedly because he had not yet provided the necessary documentation verifying his mother's illness. (*Id*. ¶ 5.) When Plaintiff returned home and provided medical documentation, his 80 hours of FMLA leave were restored. (*Id*.) The parties disagree about what prompted the change: Binkley testified that she approved the FMLA sick leave as soon as Plaintiff returned from India with the proper documentation (*id*. ¶ 6), while Plaintiff insists that he only received the leave after filing an EEO complaint and complaining to his union. (Pl.'s Resp. to Def.'s SOF [36] ¶ 6.)[2] Plaintiff contends, further, that while still in India,

---

[2]    Saggu first contacted an EEO counselor on August 22, 2017. (Def.'s SOF ¶ 76.) The record indicates that Saggu filed an EEO charge concerning Binkley's denial of leave requests, among other things, on October 14, 2017. (*See* Final Agency Decision of 1/4/19, Ex. A

2

he requested one day of annual leave because he was not able to return as soon as he had planned.  He alleges that Binkley initially approved this request but then placed him on leave-without-pay status for one day.  (Def.'s SOF ¶ 7.)  After complaining to Binkley and his union, Plaintiff eventually received one day of annual leave.  (*Id*.)

In October of 2017, Plaintiff requested three days of sick leave for cataract surgery. Binkley initially approved the request but later authorized just two days of sick leave and counted the third day as annual leave.  (*Id*. ¶ 9.)  It is undisputed that Saggu was paid for all three days of missed work and that he has never come close to using up all of his annual leave (*id*.), but he notes that he made an effort to accumulate annual leave so that he could cash out his "excessive leave" at the end of the year.  (Pl.'s Resp. to Def.'s SOF ¶ 9.)  According to Binkley, one of the days Saggu requested did not qualify as sick leave because it was for rest before his surgery. (Def.'s SOF ¶ 10.)  Plaintiff responds that Binkley's decision ignored his doctor's instructions. (Pl.'s Resp. to Def.'s SOF ¶ 10.)

Plaintiff claims, as well, that Binkley told him on at least three occasions that he was not "doing his job."  (Def.'s SOF ¶ 11.)  First, around October 2017, Binkley told him, "You're not doing your job," and "I will write you up."  (*Id*.)  Saggu testified at his deposition that there were no other employees present during this conversation.[3]  (Saggu Dep. 78:6–79:16, Ex. 1 to Def.'s SOF [30-

---

to Second Am. Compl. [15-1].)  The Postal Service EEO Office did not release a final agency decision until January 4, 2019, concluding that the evidence did not support a finding of discrimination.

It is unclear from the record exactly when Saggu's FLMA leave was restored.  (*See* Pl.'s Resp. to Def.'s SOF ¶ 6 ("Plaintiff [ ] filed his EEO Complaint and a Union Grievance against [Binkley] for her denial of FMLA and shorting his paycheck, which ultimately did get resolved but took several months to get his pay back.").)  It is also unclear when Binkley became aware of either Saggu's initial contact with an EEO counselor or his EEO complaint.  (*Compare* Binkley 1st Aff. from EEO Case No. 1J-603-0065-17 ¶ 2, Ex. 7 to Def.'s SOF [30-2] (attesting that she became aware of Saggu's first EEO complaint on "04/17," possibly meaning April 17, 2018), *with* Binkley 2nd Aff. from EEO Case No. 1J-603-0065-17 ¶ 51, Ex. 59 to Def.'s SOF [30-3] (responding "unknown" to the same question).)

[3]        In Plaintiff's statement of facts, he asserts that "[t]his was done in front of other employees in the unit."  (Pl.'s SOF ¶ 13 (citing Saggu Dep. 76–77, 78, 79).)  Because this

2].) Second, in September 2018, Binkley told him, "You need to do your job. You are not doing what you are supposed to do." Binkley made these statements on a day when Saggu's unit was shorthanded and had a backlog of mail. (Def.'s SOF ¶ 12.) Binkley allegedly pushed an all-purpose container cart in Plaintiff's direction in frustration. Plaintiff does not believe that Binkley intended to hit him, but he claims that she could have hurt him or another employee. (*Id*. ¶ 13.) Third, on September 27, 2018, Binkley allegedly told Saggu that he was not doing his job and criticized his performance as a manager in front of other employees. (*Id*. ¶ 14.) Plaintiff asserts that Binkley's statements were loud, disrespectful, and embarrassing. (Pl.'s SOF ¶¶ 10, 13; *see also* Saggu Decl. [37-1], Ex. 1 to Pl.'s SOF ¶ 4).)

Plaintiff further alleges that Binkley "micromanaged" him by calling him on the radio and assigning him more units to supervise. (Def.'s SOF ¶ 15.) When he told Binkley that the units were located too far apart to manage effectively, Binkley did not listen to him. (*Id*. ¶ 16.) On one occasion in January 2018, Binkley could not reach him on the radio, and she yelled at him in front of other employees. (*Id*.) On several occasions, Plaintiff did not have time to take a lunch break. On one such occasion, when Saggu told Binkley that he was not able to take his lunch break, she allegedly responded, "Mail has to go out first." (*Id*. ¶ 17.) Plaintiff saw other supervisors who were Black and female taking lunch breaks, and he believes that he was deprived of a lunch break because he is not Black or female.[4] Plaintiff admits, however, that Binkley instructed her employees to manage their own lunch breaks and did not require employees to request permission before going on break. (*Id*.)

---

statement is inconsistent with what Plaintiff said in his own deposition (*see* Def.'s Resp. to Pl.'s SOF [40] ¶ 13 (citing Saggu Dep. 78:6–79:16)), the court disregards it.

[4]     It is unclear from the record whether Plaintiff observed Black female supervisors taking lunch at the same time that Binkley told him "Mail has to go out first." (*See* Saggu Dep. 106:9–113:10.)

4

In January of 2018, Binkley told Plaintiff that he could no longer work overtime ("T-time") because the holiday delivery season was over. Binkley testified that she gave the same instruction to all supervisors.[5] (*Id.* ¶ 18.) Saggu testified at his deposition that he reviewed time and attendance reports showing that other supervisors, who are Black and female, were able to continue working overtime. (*Id.* ¶¶ 18–19.) The reports themselves are not in the record.

Plaintiff alleges that Binkley never invited him to apply to be the acting manager of distribution operations or gave him training opportunities. (Def.'s SOF ¶ 20.) Plaintiff admits that he did not tell Binkley he was interested in applying for the acting manager position, but he told a previous manager that he was interested back in 2013. (Pl.'s Resp. to Def.'s SOF ¶ 20.)

There is no evidence in the record that Binkley has ever made offensive comments to Saggu about his race, gender, national origin, or Sikh religion. (Def.'s SOF ¶ 21.) When asked at his deposition why he believes that Binkley was discriminating against him because of his gender, Plaintiff responded, "I can't answer that. That's a feeling." (*Id.*) When asked why he believed Binkley was discriminating against him because of his religion, Plaintiff responded, "I can't answer that." (*Id.*) Nonetheless, he has a "strong feeling" that Binkley treated him worse than "people of her ethnic group." (*Id.*) Plaintiff also cannot explain why he believes Binkley discriminated against him on the basis of his age, aside from the fact that (at the time of his deposition) he was nearly 60 years old. (*Id.* ¶ 22.)

Plaintiff has discussed his religion with Binkley only twice in the context of requesting time off for religious holidays. (*Id.* ¶ 23.) Plaintiff alleges that Binkley denied him leave on one such

---

[5] Plaintiff objects that there is no corroborating evidence of such a policy. (Pl.'s Resp. to Def.'s SOF ¶ 18.) The court overrules the objection because Binkley may testify about events of which she has personal knowledge. *See* FED. R. EVID. 602. The lack of corroborating evidence goes the weight of the evidence, not the admissibility of Binkley's testimony.

holiday, Guru Nanak's birthday.[6]  (Pl.'s SOF ¶ 9.)  Binkley's stated reason for the denial was staffing concerns, but Plaintiff asserts that other people could have covered for him.  (*Id.*)  Defendant responds that Saggu lacks personal knowledge that someone was in fact available that day, and notes that he also testified that Binkley allowed him to take the day off for Diwali.[7]  (Def.'s Resp. to Pl.'s SOF [40] ¶ 9.)  Saggu has discussed his age with Binkley only once during a discussion at work about retirement.  (Def.'s SOF ¶ 23.)  Plaintiff testified that sometime in 2018, Binkley asked: "Saggu, why you and Freddy are giving me [a] hard time?"  (*Id*. ¶ 24.)  The conversation apparently ended after she made this statement.  Freddy Thomas, Plaintiff's co-worker at the Carol Stream processing and distribution center, has also filed a discrimination lawsuit against the Postal Service alleging that Binkley discriminated against him.  (*Id.*)

## II.     Non-Selection for Other Positions

Between October 2017 and June 2018, Plaintiff applied for eight positions and one detail with the Postal Service.   Plaintiff claims that he was not selected for any of these positions because the hiring managers retaliated against him and/or discriminated against him on the basis of his race, gender, religion, national origin, and age.  (*Id*. ¶ 25.)  When asked at his deposition whether he knew that any selecting officials or review committees had spoken to Binkley about him, Saggu responded: "I really don't know the process.  . . . The only thing I know is they were of the same ethnic group.  All of them  . . . African American."  (*Id*. ¶ 77.)  He explained that he had a "feeling" that the selecting officials had not hired him because he was "of a different ethnic group."  (*Id*.)

---

[6]      Guru Nanak, the founder of the Sikh religion, was born on April 15, 1469, but his birthday is celebrated in November.  *Guru Nanak*, BBC (Oct. 7, 2011), https://www.bbc.co.uk/ religion/religions/sikhism/ people/nanak.shtml (last visited Mar. 24, 2021).

[7]      Diwali (Divali) is a major religious festival in Hinduism and Sikhism, typically celebrated in late October or November.  *Diwali: Hindu Festival*, BRITANNICA (2021), https://www. britannica. com/topic/Diwali-Hindu-festival (last visited Mar. 24, 2021).

## A.    June 2017:  Supervisor of Distribution Operations Position

In June of 2017, the Postal Service announced a job posting for a supervisor of distribution operations ("SDO") at Carol Stream.  The position had Saturdays and Sundays off and the same pay grade as Plaintiff's current position.[8]  (*Id*. at ¶ 26.)  Mike Kotula, the plant manager, was the selecting official.  Kotula created an application review committee, including Binkley and two other supervisors, Katina Powe and Doug St. John.  (*Id*.)  On June 9, 2017, Plaintiff emailed Kotula to request the position, which would have been a lateral move for him.  Saggu did not submit an application through the Postal Service's electronic application system, eCareer, but he did attach his electronic job application profile in his email to Kotula.  (*Id*. ¶ 27.)  Kotula then forwarded the message to Powe and St. John.  (*Id*. ¶ 28.) St. John's practice was to keep documents that Kotula forwarded to him for future reference, but not to take further action on an email application unless Kotula requested it.  (*Id*).

Binkley, Powe, and St. John reviewed and ranked the applications that had been submitted through eCareer.  (*Id*. ¶ 29.)  The highest-ranked candidates were interviewed, and ultimately the committee recommended that Kotula hire Nadia Seanior, a Black woman, for the position.  (*Id*.)  Seanior, born in 1986, had worked in the same role (supervisor of distribution operations) in Springfield for approximately eight months and had been a Postal Service employee for five years.  (*Id*. ¶ 33.)

The committee did not rank Plaintiff's application or interview him, but the parties disagree as to why.  (*Id*. ¶ 30.)  Defendant insists that Plaintiff was not considered because he had not submitted an application through eCareer, and Kotula had not otherwise indicated to the committee that he wanted Saggu to be considered.  (*Id*.)  Plaintiff responds that his email to Kotula

---

[8]    There is some evidence in the record that Saggu worked Wednesdays through Sundays, with Mondays and Tuesdays off.  (*See* Clock Ring Documentation, Ex. 5 to Def.'s SOF [30-2].)  Saggu has not asserted, however, that the posted position was more desirable for this reason.

was sufficient to notify the committee of his interest in the position. (Pl.'s Resp. to Def.'s SOF ¶¶ 28–30.) Plaintiff did not tell Binkley that he was applying for the position, however, and there is no evidence that she was aware he had applied informally via email. (Def.'s SOF ¶ 28.)

Plaintiff testified at his deposition that he does not believe Kotula (a white man) was discriminating against him when he selected Seanior, who is, as noted, Black, and who had submitted EEO complaints prior to applying for the position. (*Id.* ¶¶ 31, 33.) Saggu nonetheless has a "feeling" that the review committee may have been discriminating against him. (*Id.*) Plaintiff believes that he should have been selected because "I have a lot more experience than Nadia." (*Id.* ¶ 32.) He admits, however, that he has not seen her application materials and is unaware of how long she worked as a supervisor. (*Id.*)

### B. November 2017: Supervisor of Business Mail Entry Positions

In November of 2017, Plaintiff applied through eCareer to be a supervisor of the business mail entry ("BME") units in Carol Stream and Bedford Park.[9] (*Id.* ¶ 34.) He had previously served a detail as a BME supervisor between October 2014 and August 2016. (*Id.* ¶ 35.) Cathy Meeks, a Black woman, supervised Plaintiff during the detail. She was also the selecting official for both positions when Saggu applied in 2017. (*Id.*) Meeks testified that Plaintiff did not perform well during his detail. (*Id.* ¶ 36.) According to Meeks, Saggu did not appear to understand the role and could not help employees when they had questions. Meeks testified that clerks whom Saggu supervised complained that he was unable to assist them.[10] (*Id.*) She also testified that Saggu

---

[9] Defendant's statement of facts refers to the location of one position alternately as "Bolingbrook" or "Bedford Park." (*Compare* Def.'s SOF ¶¶ 34, 39, 40, *with id.* ¶ 37.) Plaintiff does not object to the discrepancy. (*See* Pl.'s Resp. to Def.'s SOF ¶¶ 34, 37, 39, 40). The court notes that Plaintiff's job application describes the position as in Bedford Park, so for purposes of resolving this motion, the court will refer to the posting as in Bedford Park. (*See* Saggu Application for Job Posting No. 10149071/NB 10160220, Ex. 19 to Def.'s SOF [30-2].)

[10] Plaintiff objects to "the testimony of complaints by clerks." (Pl.'s Resp. to Def.'s SOF ¶ 36.) This objection—presumably on hearsay grounds, *see* FED. R. EVID. 801(c), 802—is overruled. The court does not understand the statements to be offered for their truth. Defendant may instead introduce them to show their effect on the recipient, Meeks, because the complaints

sometimes failed to notify her when he would be unavailable, and she was sometimes unable to reach him.[11]

Meeks personally reviewed applications for the position in Bedford Park.  Because there were only seven applicants, Meeks did not create a review committee, but she did rate the applications in a requirement-by-applicant matrix.  (*Id*. ¶ 37.)  Saggu scored highly enough to be eligible for an interview.  (*Id*.)  There were more applicants for the position in Carol Stream, so Meeks created a committee to review the applications for that position.  The committee gave Saggu's application the same score that Meeks had given him for the Bedford Park position and recommended him for an interview.  (*Id*. ¶ 38.)  Meeks then interviewed Saggu for both positions.[12]  (*Id*. ¶ 39.)  Meeks testified that she asked each applicant the same set of questions and selected the applicants with the highest scores.  (*Id*.)

---

informed her opinion of Plaintiff's performance as a supervisor.  *See* 31A C.J.S. *Evidence* § 422 (2021).

[11]    Plaintiff's foundation objection to this portion of Meeks's testimony (*see* Pl.'s Resp. to Def.'s SOF ¶ 36) is also overruled.  Meeks's testimony was based on her personal knowledge. *See* FED. R. EVID. 602.

[12]    In a declaration attached to his Statement of Facts, Plaintiff alleges for the first time that Meeks said something that made him feel uncomfortable during the interview—specifically, apparently in reference to how he was dressed, Meeks commented that Saggu was "looking young and handsome."  (*See* Pl.'s SOF ¶ 22; Saggu Decl. ¶ 8.)  Saggu appears to believe that this was in fact a comment on the fact that he is old and has gray hair.  (*Id*.)  Defendant objects that this portion of Saggu's declaration conflicts with the testimony at his deposition that Meeks had not made any discriminatory statements during the interview.  (Def's Reply [39] at 9–10; Def.'s Resp. to Pl.'s SOF ¶ 22; Saggu Dep. 186:3–11, 196:13–20.)
The court agrees.  Plaintiff cannot contradict his deposition testimony with a later declaration.  *See James v. Hale*, 959 F.3d 307, 315–16 (7th Cir. 2020) ("In this circuit the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony.")  Plaintiff has not offered any explanation for the belated introduction of this evidence.  (*See* Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. [38] (hereinafter "Pl.'s Opp'n") at 11; Pl.'s SOF ¶ 22.)  In any event, Meeks's alleged comment that Saggu was looking "young and handsome" is not facially discriminatory or objectively offensive, nor does it establish that Meeks's stated reasons for not selecting Saggu were pretextual.

For the position in Bedford Park, Meeks selected Antoine Burns, a Black male who had not filed EEO complaints and was born in 1978. (*Id.* ¶¶ 40–41.) Meeks testified that she selected Burns because he had prior experience in the BME unit and performed well in the interview. (*Id.* ¶ 40.) Burns's written application received the highest score of all applicants. (*Id.* ¶ 41.) Saggu believes that Meeks gave Burns better scores because he is a member of her ethnic group and younger than Saggu.[13] (Pl.'s Resp. to Def.'s SOF ¶ 40; Pl.'s SOF ¶ 22.) Plaintiff notes that Burns's application did not mention any awards he had received while at the Postal Service. (Pl.'s SOF ¶ 21; *see* Burns Application, Ex. 24 to Def.'s SOF [30-2]).) By contrast, Plaintiff notes the awards he earned several years earlier in his role as acting supervisor of distribution operations from 2001 through 2008. (*See* Saggu Application for Job Posting No. 10149069/NB 10160218, Ex. 18 to Def.'s SOF; Saggu Application for Job Posting No. 140149701/MNB 10160220, Ex. 19 to Def.'s SOF.) Defendant does not dispute that Plaintiff received awards, well before his promotion to the position of SDO in 2013, for special achievement as acting SDO, and for not using accumulated sick leave. (Def.'s Resp. to Pl.'s SOF ¶ 4.) The court notes that nearly ten years passed from the time of Saggu's last performance award until his application for the positions at issue.

For the position in Carol Stream, Meeks selected Lakeisha Koonce, a Black woman who had not filed EEO complaints and was born in 1979. (Def.'s SOF ¶¶ 42, 44.) Meeks considered Koonce uniquely qualified because she had previously supervised BME units at four locations. (*Id.* ¶ 43.) She also received the highest score on her written application. (*Id.* ¶ 44.) As with the selection of Burns, Saggu believes that Meeks gave Koonce better scores because she is a member of her ethnic group and younger than Saggu. (Pl.'s Resp. to Def.'s SOF ¶ 42; Pl.'s SOF

---

[13] Plaintiff asserts that he was more qualified than Burns, in part, because he had read Burns's "investigative file" when Burns was hired at the Postal Service and "believed [Saggu] had better credentials and more experience than Burns." (Pl.'s SOF ¶ 22.) Burns's file is not in evidence, and reliance on Saggu's characterization of its contents would present hearsay problems.

¶ 23.)  Meeks, by contrast, testified that Saggu did not demonstrate knowledge of the goals of the BME unit during his interview and did not seem prepared.  (Def.'s SOF ¶ 45.)  Saggu admitted at his deposition that he did not know about Koonce's BME experience.  (*Id*. ¶ 46.)

### C.    December 2017 – March 2018: Inventory Control Specialist Positions

Saggu then requested lateral transfers to three open inventory control specialist positions. Brenda Walden, a Black woman, was the senior inventory control specialist at Carol Stream and was the selecting official for all three positions. (*Id*. ¶ 47.)  Unlike Saggu's current position, these positions are not supervisory and are not eligible for overtime or a night deferential.  (*Id*. ¶ 48.)

In December 2017, Saggu emailed Walden requesting a lateral assignment.  Walden told him to apply through eCareer, and Saggu did so.  (*Id*. ¶ 49.)  Walden created an application review committee, which included three people who did not know Saggu.  (*Id*. ¶ 51.)  Saggu's written application received the highest score, so he was selected for a telephone interview with Walden. (*Id*. ¶ 52.)  Walden stated in an EEO affidavit that she did not select him because he did not demonstrate interest in the position or respond well to questions.[14]  (*Id*. ¶ 53.)  In particular, his answers focused primarily on his experience running a gas station and convenience store, not the role of inventory control at the Postal Service.  (*Id*. ¶ 57).  Saggu contends that he was prepared and responded to all of Walden's questions.  (Pl.'s Resp. to Def.'s SOF ¶ 53; Pl.'s Decl. ¶ 10.)

Because Walden did not select anyone from the first round of applicants, she re-posted the position and allowed applicants from a larger pool.  (Def.'s SOF ¶¶ 53–54.)  The review committee, comprised of the same people, gave Saggu the same score.  (*Id*. ¶ 54.)  The record

---

[14]    Walden passed away during the pendency of this litigation.  Plaintiff does not object to the admissibility of her affidavit, and Defendant argues that it is admissible under FED. R. EVID. 807.  (Def.'s Reply at 11 n.5.)  The court will consider the affidavit on summary judgment because it (1) has circumstantial guarantees of trustworthiness (it was given voluntarily under penalty of perjury), (2) is material to Plaintiff's claims, (3) has probative value as to Walden's hiring decision, (4) is supported by the interests of justice, and (5) Plaintiff had notice that Defendant would rely on the affidavit.  *See United States v. Moore*, 824 F.3d 620, 622 (7th Cir. 2016).

is unclear as to whether Walden interviewed Saggu a second time. (*See* Def.'s Reply [39] at 12–13 (discussing the mixed factual record).) Regardless, Walden eventually selected Angela Buchanan, a Black woman born in 1973 who had not made EEO complaints. (Def.'s SOF ¶¶ 55–56.) Buchanan had worked at the Postal Service for over ten years, including three years as a complaint and inquiry clerk. (*Id.* ¶ 56.) Plaintiff believes the position was reposted because Walden did not want him to have the position, and because Buchanan had not applied for the first posting. (Pl.'s Resp. to Def.'s SOF ¶ 53; Pl.'s SOF ¶ 28.) But the first posting, unlike the second posting, was limited to non-bargaining unit employees (Def.'s SOF ¶ 49), and Buchanan was in the bargaining unit. (Pl.'s SOF ¶ 28.) Saggu believes that Walden discriminated against him on the bases of race, gender, and age by selecting Buchanan. (Def.'s SOF ¶ 58.) He also speculates that Walden may have learned about his EEO complaints from other employees in the building. (*Id.*)

In March 2018, Walden posted a third inventory control specialist position. (*Id.* ¶ 59.) Saggu emailed Walden to request the transfer and submitted the same written application that he had submitted for the previous two postings. (*Id.* ¶ 60.) The review committee gave him the same score, but because he was not among the top scorers of the 45 applicants, he was not recommended for an interview. (*Id.*) Walden ultimately selected Mark Hodges, a Black man born in 1978 who had not made EEO complaints. (*Id.* ¶¶ 61–62.) Hodges had previously worked as a retail specialist at the Postal Service, a role that included tracking inventory for various post offices. (*Id.* ¶ 61.) Saggu believes that he should have been selected because "I have a lot more experience as a supervisor and a titled supervisor" and "a lot more experience in my field," in reference to distribution operations. (*Id.* ¶ 63.)

### D. March 2018: Supervisor of Remittance Mail Postage Due and Supervisor of Distribution Operations Positions

In early 2018, the Carol Stream facility had two openings for supervisors of distribution operations, both during a different shift than Saggu's shift. One posting sought someone with

experience in remittance mail, including bar-coded bills, statements, and payments. (*Id*. ¶ 64.) This position is typically paid at the EAS-20 level, as opposed to the EAS-17 level at which Saggu was paid in his position as a supervisor of distribution operations. The Carol Stream plant manager—Quentin Mayberry, a Black man—was the selecting official for both positions. (*Id*.)

In March 2018, Saggu emailed Mayberry requesting a lateral assignment to either of the two positions. (*Id*. ¶ 65.) According to Saggu, Mayberry told him that a lateral assignment was not allowed for either position, so he would have to apply through eCareer. (Pl.'s Resp. to Def.'s SOF ¶ 66; Pl.'s SOF ¶ 32; Pl.'s Decl. ¶ 12.) Saggu ultimately applied for both positions through eCareer. (Def.'s Resp. to Pl.'s SOF ¶ 32.)

For the remittance mail position, Mayberry selected James Davis, a male of unspecified race born in 1959 who had previously filed EEO complaints. (Def.'s SOF ¶¶ 66, 72.) Mayberry testified that he selected Davis because of his customer service experience and his performance as a detail to the remittance mail unit. (*Id*. ¶ 66.) Davis had requested a lateral transfer in December of 2017. (Email from Davis to Mayberry of 12/21/17, Ex. 50 to Def.'s SOF [30-3].) Davis's transfer had been preliminarily approved in December of 2017, but the transfer was not formally approved until May of 2018. (*See* Def.'s Resp. to Pl.'s SOF ¶ 35 (citing Mayberry EEO Aff. ¶¶ 11, 12, Ex. 51 to Def.'s SOF [30-3]; Duewert EEO Aff. ¶¶ 14–17, Ex. 61 to Def.'s SOF [40-2]; Email from St. John to Barcik of 5/4/18, Ex. 62 to Def.'s SOF [40-2]).) Saggu testified that Davis's selection for the remittance mail position led Saggu to believe that a lateral transfer was in fact possible. (Pl.'s SOF ¶ 33; *see also* Saggu Dep. 238:11–239:16.) Saggu believes that he should have been selected because has more "overall" supervisory experience, in that he managed a convenience store for nine years. (Def.'s SOF ¶ 68.) He also believes that Mayberry discriminated against him because Mayberry "never wanted to listen" to him, and Saggu once heard Mayberry say, "You got it, man," to Davis. (*Id*.)

13

For the supervisor of distribution operations position, Mayberry selected another lateral transfer, Steve Saflarski. (*Id*. ¶ 69.) Saflarski is a male of unspecified race, born in 1965, who had not previously filed EEO complaints. (*Id*. ¶ 72.) Saflarski requested a lateral transfer via email on March 16, 2018, but the record suggests that he also submitted an application through eCareer. (*See* Email from Saflarski to Mayberry of 3/16/18, Ex. 53 to Def.'s SOF [30-2].) Mayberry testified that he selected Saflarski because he had twenty years of experience as a supervisor and was the most qualified for the position. (Def.'s SOF ¶ 70.) Saflarski had previously worked in the same position on the night shift, but he could no longer work that shift due to a health condition. (*Id*. ¶ 69.) It is unclear from the record precisely when Saflarski was selected. (*See* Mayberry Dep. 40:19–24, Ex. 49 to Def.'s SOF [30-3].)

Saggu believes that Davis and Saflarski's selection as lateral transfers demonstrates that what Mayberry told him about the unavailability of lateral assignments in March of 2018 was not true. (Pl.'s SOF ¶ 35.) Defendant denies this, explaining that the Postal Service's national director of human resources had imposed a temporary moratorium on lateral transfers beginning in January of 2018. (Def.'s Resp. to Pl.'s SOF ¶ 35.) Mayberry also testified that it was a confusing time for managers attempting to fill vacancies and that several jobs were taken down and reposted. (*Id*.) Saggu believes that Mayberry was retaliating against him because Mayberry allegedly asked him, "Why are you giving Bernadette [Binkley] a hard time?" (Def.'s SOF ¶ 71.) It is unclear from the record when Mayberry made this statement, but he did not mention Saggu's EEO complaints during the conversation. (*Id*.) The parties agree it was no secret that Saggu and Binkley did not have a good working relationship. (*Id*.)

### E. June 2018: Supervisor of Distribution Operations Detail

In June of 2018, the manager of distribution operations on a different shift than Saggu and Binkley—Kathy Brown, a Black woman—asked if he wanted to work as a supervisor on her shift. (*Id*. ¶¶ 73, 75.) Saggu allegedly told Brown that he was interested but wanted to discuss it with

his wife first.  Three or four weeks later, Saggu followed up with Brown to let her know that his wife had agreed to the change.  Brown allegedly responded, "Fine. Let me talk to Mayberry, and I will get back to you." (*Id*.)  Later, according to Saggu, Brown told him that "[Mayberry] says you don't even come to work." (*Id*. ¶ 74.)  Saggu believes that this statement was in reference to his having taken leave for a FMLA-approved health condition, and he told her that it would be helpful for him to change to a different shift. (*Id*.)  Brown allegedly agreed to talk to Mayberry again, but she did not ultimately offer Saggu the position. (*Id*. ¶ 75.)  Saggu believes that the decision not to detail him to Brown's shift was discriminatory because two other supervisors on that shift are Black, female, and younger than him. (*Id*.)  He admits, however, that he never talked to Mayberry about moving to Brown's shift. (*Id*.)

## III.    EEO Complaints

On August 22, 2017, Saggu contacted an EEO counselor and complained about Binkley's denial of his leave request to visit his mother in India. (*Id*. ¶ 76.)  He has exhausted claims for 19 allegedly adverse employment actions in two proceedings before the Postal Service's EEO Office.  Saggu timely filed this lawsuit within 90 days of the final agency decisions. (*Id*.)

## IV.    Additional Alleged Comparator Employees

Finally, Saggu has identified several Black employees who were allegedly similarly situated but treated more favorably by Binkley and other (unidentified) supervisors.  This list reflects the extent of Plaintiff's allegations for each comparator.[15]

- Glenda Bruce was allegedly treated more favorably because Binkley gave her less work, allowed her to work as acting manager of distribution on the weekends, and allowed her to take leave. (*Id*. ¶ 78.)  Saggu does not know whether Bruce ever requested leave that was denied. (*Id*.)  Defendant objects that Saggu's assertion that Bruce was granted leave for a family emergency is based solely on hearsay and should be stricken or disregarded. (Def.'s Resp. to Pl.'s SOF ¶ 12 (citing Saggu Dep. 57:19–58:8).)  The court agrees.  Saggu asserts, as well, that Bruce was permitted to continue working overtime in January of 2018,

---

[15]    Significantly, it was Defendant who furnished the court with this list of alleged comparators.  Plaintiff did not object to the list, and made almost no mention of these comparators in his response in opposition to the motion for summary judgment.  Plaintiff has not specified the protected characteristics of these comparators (age, religion, etc.) aside from their race.

despite the fact that Binkley had instructed that Saggu could no longer work overtime. (Pl.'s SOF ¶ 18 (citing Saggu Dep. 123:15–125:24).)  Bruce's time and attendance report is not in the record.

- Victor Dubois was allegedly treated more favorably because he was trained to serve as acting manager of distribution operations and was allowed to take leave.  Saggu does not know whether Dubois ever requested leave that was denied.  (Def.'s SOF ¶ 78.)

- Kimberly Clark, who works on Saggu's shift, was allegedly treated more favorably because she was given a level 17 job (the same level as Saggu).  (*Id*.)

- Danielle Cobbins, who was previously a supervisor on Saggu's shift, was allegedly treated more favorably because she was given a lateral assignment in transportation and is now acting manager of distribution operations on Saggu's shift.  (*Id*. ¶ 79.)

- Darren Walker, who works on a different shift than Saggu, was allegedly treated more favorably because he was trained as acting manager of distribution operations.  (*Id*.)

- Annie Plane, who works on a different shift than Saggu, was allegedly treated more favorably because she was trained as acting manager of distribution operations and is now a titled manager of distribution operations.  (*Id*.)

- Ronda Mignis, who works on a different shift than Saggu, was allegedly treated more favorably because she was trained as acting manager of distribution operations.  (*Id*.)

- LaDonna Singleton, who works on a different shift than Saggu, was allegedly treated more favorably because she was given a supervisor position on the weekends when another employee was not working.  (*Id*.)

- Lillian Riley was allegedly treated more favorably because she is allowed to run the postage due unit while Davis (the man Mayberry selected for the remittance mail position that Saggu applied for) is on long-term leave.  (*Id*. ¶ 80.)

- Michelle Woods, who works on Saggu's shift, was allegedly treated more favorably because she was trained as acting manager of distribution operations.  (*Id*.)  Saggu contends that, like Glenda Bruce, Woods was allowed to continue working overtime in January of 2018 when Binkley instructed that Saggu could no longer work overtime.  (Pl.'s SOF ¶ 18 (citing Saggu Dep. 124:15–125:24).)  Woods's time and attendance report is not in the record.

- Candice Porter was allegedly given the opportunity to be the postmaster in another location because she is the relative of Katina Powe (a member of the review committee for one of the positions Saggu applied for).  (Def.'s SOF ¶ 80)

## **LEGAL STANDARD**

Summary judgment is appropriate if there is no genuine dispute of material fact and the

moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  A genuine dispute

16

of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts should draw all inferences in favor of the nonmoving party, but a nonmovant is "not entitled to the benefit of inferences that are supported only by speculation or conjecture." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, "the nonmoving party must set forth specific facts showing a genuine issue for trial." *Abrego v. Wilkie*, 907 F.3d 1004, 1011–12 (7th Cir. 2018) (citing *Matsushita*, 475 U.S. at 587). "If there is no triable issue of fact on even one essential element of the nonmovant's case, summary judgment is appropriate." *Boss*, 816 F.3d at 916.

## DISCUSSION

The Postal Service has moved for summary judgment. As explained below, the court agrees that there are no disputes of material fact in this record. The majority of Plaintiff's claims do not arise from materially adverse employment actions and therefore are not actionable under Title VII or the ADEA. Of the incidents that arguably amount to adverse employment actions, Plaintiff has failed to show that Defendant's explanations for taking those actions were pretextual. Finally, Plaintiff's evidence is insufficient to establish a hostile work environment.

## I.     Title VII and ADEA Discrimination

Title VII prohibits an employer from discriminating against its employees on the bases of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). The ADEA further prohibits employment discrimination on the basis of age. 29 U.S.C. § 623(a)(1). To succeed on a Title VII discrimination claim, a plaintiff must prove that "[1] he is a member of a class protected by the statute, [2] that he has been the subject of some form of adverse employment action (or that he has been subjected to a hostile work environment), and [3] that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Abrego v. Wilkie*, 907 F.3d

17

1004, 1012 (7th Cir. 2018). For age discrimination claims, a plaintiff must prove that his age was the but-for cause of the challenged job action, meaning, "but for his age, the adverse action would not have occurred." *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (citations omitted). At summary judgment, the court must determine whether the evidence as a whole "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Abrego*, 907 F.3d at 1012 (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)); *see also Tyburski*, 964 F.3d at 598 (applying the same test in the ADEA context).

One way of analyzing evidence in an employment discrimination case is referred to as the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). To establish a prima facie case of employment discrimination under this framework, a plaintiff presents evidence that "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Tyburski*, 964 F.3d at 598 (citations omitted). "If the plaintiff meets each element of her prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (citations and internal quotation marks omitted). This burden-shifting approach is not the only way to proceed in establishing discrimination, however, and the Seventh Circuit has cautioned that "courts must assess the evidence 'as a whole, rather than asking whether any particular piece of evidence proves the case by itself,' [and] regardless of whether the court also analyzes the evidence pursuant to *McDonnell Douglas*." *Id.* (quoting *Ortiz*, 834 F.3d at 765).

Defendant does not dispute that Plaintiff is a member of a protected class: he is male, Asian, of Indian descent, Sikh, and over the age of 40. Instead, Defendant argues that most of

the incidents Saggu complained of were not adverse employment actions, and of those that arguably were, Defendant has provided legitimate, nondiscriminatory reasons for the actions. (*See* Def.'s Mem. in Support of Mot. for Summ. J. [29] (hereinafter "Def.'s Mem.") at 14–18.) Moreover, Defendant argues that Plaintiff cannot show that Defendant's reasons were pretextual. (*Id*. at 21–23.)

### A.    Adverse Employment Actions

Under Title VII and the ADEA, an adverse employment action is "one which visits upon a plaintiff a significant change in employment status." *Boss*, 816 F.3d at 917 (citation and quotation marks omitted) (Title VII); *see also Fields v. Bd. of Educ. of City of Chicago*, 928 F.3d 622, 625–26 (7th Cir. 2019) (ADEA). Examples of adverse employment actions in the discrimination context include changes to an employee's pay, career prospects, or "work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Boss*, 816 F.3d at 917 (citation omitted). The action "must be *materially* adverse, not merely an inconvenience or a change in job responsibilities." *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (emphasis added). Courts evaluate each allegedly adverse incident on its own, rather than together. *Boss*, 816 F.3d at 918 ("Insofar as [plaintiff] argues for a 'totality of circumstances' view, the caselaw limits that approach to his hostile work environment claims.").

### 1.    Alleged Discrimination by Binkley

The vast majority of allegedly discriminatory actions by Binkley were not adverse employment actions. First, denials of leave requests are generally not materially adverse employment actions. *See Griffin*, 356 F.3d at 829 (refusal to approve annual leave requests when work backlogged was not an adverse employment action); *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 301–02 (7th Cir. 2004) (two-month delay in overtime payment and non-payment during a disputed absence did not cause a significant change in worker's employment conditions). In this case, Binkley's initial denial of Saggu's leave request for travel to India was not an adverse

action; regardless of whether she properly withheld FMLA leave until Saggu returned with the proper documentation, there is no dispute that he eventually received all of the leave he had requested. (*See* Def.'s SOF ¶ 6; Pl.'s Resp. to Def.'s SOF ¶ 6.) Similarly, Binkley's initial denial of one day of annual leave while Saggu was still in India was not an adverse action because he ultimately was granted leave. (*See* Def.'s SOF ¶ 7; Pl.'s Resp. to Def.'s SOF ¶ 7.) Binkley's insistence that Saggu take two days of sick leave and one day of annual leave in connection with cataract surgery, as opposed to three days of sick leave as he had requested, was also not an adverse action. (*See* Def.'s SOF ¶¶ 9–10.) Plaintiff argues that he wanted to use sick leave rather than annual leave so that he could cash out his "excessive" annual leave at the end of the year (*see* Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. [38] (hereinafter "Pl.'s Opp'n") at 6–7), but he has not demonstrated that employees are ordinarily entitled to classify leave as they see fit, or that his race, national origin, religion, sex, or age had anything to do with the sick leave / annual leave categorization.

Next, Binkley's alleged "micromanagement" of Saggu, including her comments that he was not doing his job, does not amount to an adverse employment action. Employers are generally free to "micro-manage and require as much petty communication as [they] wish." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 466 (7th Cir. 2014). Saggu may have felt embarrassed by Binkley's blunt feedback, particularly when other employees were present, but courts have repeatedly held that trivial insults and slights are not actionable under Title VII or the ADEA. *See Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1107 (7th Cir. 2012) ("personality conflicts" and "snubbing by supervisors" not actionable); *Griffin*, 356 F.3d at 829 (comments that employee was a "bad influence on the office" not actionable); *Blackmon v. City of Chicago*, 836 F. Supp. 2d 655, 665 (N.D. Ill. 2011) (being yelled at by supervisor not actionable). Binkley's threat to "write him up" when there was a backlog of mail is also not actionable. *See Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016) (threats of unspecified

20

disciplinary action not actionable for Title VII retaliation claim where threats had no effect on compensation or career prospects); *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 731 (7th Cir. 2004) (being "written up" was not an adverse action where employee failed to identify tangible job consequences).

Similarly, Binkley's decision to assign Saggu additional units to supervise is not actionable because harder work assignments do not amount to adverse employment actions. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007); *Griffin*, 356 F.3d at 829; *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). The incident in which Binkley pushed an all-purpose container cart in Saggu's direction, while clearly unprofessional, was not an adverse action; Saggu himself does not believe that Binkley intended to hit him with the cart (Def.'s SOF ¶ 13), and it did not cause a significant alteration in his work conditions. Nor did Saggu's occasional inability to take lunch breaks. *See Rizzo v. Sheahan*, No. 97 C 3995, 2000 WL 679982, at *13 (N.D. Ill. May 22, 2000) (denial of lunch break was not an adverse action). Plaintiff concedes that Binkley allowed employees to manage their own lunch breaks, meaning they did not need to ask Binkley for permission before taking lunch. (Def.'s SOF ¶ 17.) And although Saggu alleges that he saw Black female supervisors taking lunch breaks, there is no evidence that Binkley required him to continue working when other supervisors were permitted to schedule their lunch breaks.

Finally, Binkley's other alleged deficiencies as a manager, including her failure to provide Saggu with unspecified training and to encourage him to apply to be an acting manager of distribution operations, are not adverse employment actions. Plaintiff has not provided evidence, aside from general statements in his deposition testimony, that Defendant or Binkley denied him training opportunities for which he was otherwise eligible. *See Pafford v. Herman*, 148 F.3d 658, 669 (7th Cir. 1998) ("[plaintiff's] conclusory statements that she was not trained are not sufficient to defeat [defendant's] motion for summary judgment"). Plaintiff argues that he expressed interest

21

in becoming an acting manager of distribution operations back in 2013. (Pl.'s Resp. to Def.'s SOF ¶ 20.) But it is unreasonable to expect that Binkley, who was not his supervisor at the time, should have been aware of or anticipated this interest. Nor is it reasonable to assume that her failure to provide him with training was a function of his protected status.

### 2. Non-Selection for Lateral Transfers

The denial of a transfer with "parallel pay, benefits, and responsibilities" is not an adverse employment action. *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 275 (7th Cir. 2004). By contrast, the denial of a transfer that would have resulted in higher pay or benefits may be an adverse action. *See Brown*, 700 F.3d at 1108 (citing *Johnson,* 325 F.3d at 900 ("the denial of an opportunity to move to [a higher paying] position, unlike the mere denial of a lateral transfer, constitutes a materially adverse employment action")). Most of the positions that Saggu applied for were lateral transfers. He has not demonstrated that they provided greater promotional opportunities or other tangible benefits, and his non-selection for those positions is therefore not actionable under Title VII or the ADEA.

Saggu applied three times to be an inventory control specialist, but unlike his current position (supervisor of distribution operations), the inventory control specialist position is not supervisory and would have rendered Saggu ineligible for overtime or a night deferential. (Def.'s SOF ¶ 48.) Denial of a purely lateral transfer, particularly one that could have resulted in *less* pay, is not an adverse employment action. *See Arteaga v. Brennan*, No. 17-CV-1282, 2019 WL 6497953, at *5 (E.D. Wis. Dec. 3, 2019) (Postal Service's denial of transfer to position with less pay, less responsibility, and less promotional opportunity was not an adverse action).

Even if Plaintiff's non-selection for the inventory control positions amounted to adverse actions, Defendant has offered legitimate, nondiscriminatory reasons for its decisions. To recap, Walden (the hiring officer) interviewed Saggu for the first posting because he received the highest score on his written application. However, she was unimpressed with his interview because,

22

according to Walden, he did not demonstrate interest in the position or respond well to questions. (Def.'s SOF ¶ 53.) Walden then re-posted the position and allowed applicants from a wider pool. She ultimately selected Angela Buchanan, a Black woman born in 1973 who had worked at the Postal Service for over ten years. (*Id*. ¶¶ 55–56.) Plaintiff believes that Walden made her decision to repost the position on the basis of race, gender, and age, but he has not provided any evidence, other than his personal belief, that Walden's failure to select him for the initial positing was discriminatory. (*See* Pl.'s SOF ¶ 28; Def's Resp. to Pl.'s SOF ¶ 28.) Courts agree that a plaintiff's subjective belief, by itself, is insufficient to create a genuine issue of material fact. *Boss*, 816 F.3d at 917 (collecting cases).

Plaintiff objects that Buchanan did not have supervisory experience, that her application did not mention "awards" (as his did), and that Walden stated that "experience" would be the most important factor. (*See* Pl.'s SOF ¶ 29.) According to Plaintiff, his ten years of experience managing a convenience store made him objectively more qualified. (*Id*.) Buchanan's application may not have listed awards, but it did mention that she had worked at the Postal Service since 2005 and had managed a nail salon for four years. (Def.'s Resp. to Pl.'s SOF ¶ 29.) To the extent that these qualifications were relevant to Walden's hiring decision, Plaintiff is wrong to suggest that an applicant's years of experience should be outcome-determinative. That an employer values experience does not suggest that the employer's failure to select a candidate with more years of experience—regardless of the nature of that experience—must be a function of discrimination.

Moreover, Saggu's allegations of sex discrimination are undermined by Walden's selection of Mark Hodges (a Black man born in 1978) for the third inventory control specialist posting. Hodges had experience with inventory control due to his prior work as a retail specialist at the Postal Service. Plaintiff believes that he had "a lot more experience as a supervisor" and "a lot more experience in [his] field," meaning distribution operations. (Def.'s SOF ¶ 63.) But as

23

explained above, inventory control specialists do not have supervisory responsibilities, so Walden could have reasonably concluded that Saggu's experience as a supervisor was not pertinent to the job.  And once again, Plaintiff's subjective belief that he had more relevant experience is insufficient to survive summary judgment.  *See, e.g.*, *Lucas v. Brennan*, No. 17-cv-8964, 2020 WL 127768, at *4 (N.D. Ill. Jan. 10, 2020) (granting summary judgment and explaining that the plaintiff "offers no evidence of a discriminatory or retaliatory motive other than her feeling. This is not enough.").

Plaintiff's non-selection for the March 2018 posting for a supervisor of distribution operations in Carol Stream was also not an adverse action: the position involved the same responsibilities as Plaintiff's current role but on a different shift.  Plaintiff has not offered evidence that this shift offered better pay or was otherwise more desirable for his career prospects.  Even if the court were to characterize Saggu's non-selection as an adverse action, Saggu's allegations that Defendant routinely selected younger Black women over him are undercut by the fact that Mayberry, a Black man, selected Steve Saflarski, a male of unspecified race born in 1965 (just six years younger than Saggu).  Defendant has also provided legitimate, nondiscriminatory reasons for selecting Saflarski, who had twenty years of experience as a supervisor and required the transfer as a medical accommodation.  (Def.'s SOF ¶¶ 69–70.)  There seems to have been a miscommunication between Saggu and Mayberry as to whether this position was available to lateral transfers, but there is no evidence that the miscommunication was intentional.  In fact, as discussed above, there was a temporary moratorium on lateral transfers in January of 2018, and Mayberry testified that several job postings were taken down and reposted during this period. (Def.'s Resp. to Pl.'s SOF ¶ 35.)

Defendant argues that Plaintiff has forfeited any claims based on his non-selection for (1) a lateral transfer to a supervisor of distribution operations position in June 2017, or (2) a detail to a supervisor of distribution operations in June of 2018.  (Def.'s Reply at 6.)  Indeed, Plaintiff

makes no mention of either of these incidents in his brief opposing summary judgment or his own statement of facts, nor does he mention the hiring managers for either position (Mike Kotula and Kathy Brown). The court concludes that Plaintiff has forfeited claims based on these incidents. *See Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 374 & n.2 (citing *Palmer v. Marion Cnty.*, 327 F.3d 588, 597–98 (7th Cir. 2003)).

And any claims based on these decisions would likely fail because they concern denials of lateral transfers and therefore are not actionable. *See Dandy*, 388 F.3d at 275. First, the June 2017 posting had the same paygrade as Saggu's current position. (Def.'s SOF ¶ 26.) Saggu believes that he should have gotten an interview on the basis of his qualifications, but he concedes that he did not submit an application through eCareer. And there is no evidence that Binkley, who was on the review committee, knew that he had applied informally via email. (*Id*. ¶ 28.) A mere feeling that the review committee was nonetheless discriminating against him is insufficient to survive summary judgment on this claim.

Second, a claim based on Saggu's non-selection for the June 2018 detail would fail as well. The position would have been the same as Saggu's current role, but on a different shift with a different manager of distribution operations (Kathy Brown). Plaintiff did not formally apply for this position; rather, Brown asked him if he was interested in switching to her shift, and he eventually told her that he was. (*Id*. ¶¶ 73, 75.) The record does not specify who was eventually selected for this position, let alone his or her demographic information. Plaintiff nonetheless believes the decision not to select him was discriminatory because two other supervisors on that shift were younger Black women. (*Id*. ¶ 75.) Without more, however, the court cannot conclude that Defendant's failure to move Plaintiff to a position doing the same job on a different shift was discriminatory.

### 3. Failure to Promote

Unlike the denial of a purely lateral transfer, failure to promote can be an adverse action. *See Johnson,* 325 F.3d at 900 (Title VII); *Tyburski*, 964 F.3d at 598 (ADEA). Plaintiff arguably suffered adverse employment actions when Defendant did not select him for the supervisor of BME positions in Carol Stream and Bedford Park, as well as the supervisor of remittance mail position. It is unclear from the record whether the BME positions paid more or offered additional benefits, but the court will assume for the sake of argument that they would have constituted a promotion for Saggu. It is more apparent that the supervisor of remittance mail position would have been a promotion for Saggu because it is typically paid at the EAS-20 level, as opposed to the EAS-17 level for a supervisor of distribution operations. (Def.'s SOF ¶ 64.) The court addresses Plaintiff's arguments for pretext below.

### B. Pretext

After a plaintiff has established a prima facie case of discrimination and an employer has offered legitimate, nondiscriminatory reasons for taking an adverse employment action, the plaintiff can defeat summary judgment by presenting evidence that the defendant's stated reasons are pretextual. *See Tyburski*, 964 F.3d at 598. To meet this burden, a plaintiff "must identify such weaknesses, implausibilities, inconsistencies, or contradictions in the defendant's proffered reasons that a reasonable person could find them unworthy of credence and hence infer that the defendant did not act for the asserted non-discriminatory reasons." *Widmar*, 772 F.3d at 465 (citation omitted). Pretext means "a lie—a phony reason meant to cover up a disallowed reason." *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005). "[A]n employer's decision to favor one candidate over another can be 'mistaken, ill-considered or foolish, [but] so long as [the employer] honestly believed these reasons, pretext has not been shown.'" *Id.* (citation omitted).

To establish pretext on the basis of an employee's qualifications, the plaintiff must show that his qualifications "are so favorable . . . that there can be *no dispute* among reasonable

persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Robertson*, 949 F.3d at 381 (emphasis in original, citations omitted). "An employee's own opinions about [his] ... qualifications [do not] give rise to a material factual dispute." *Id*. (internal quotation marks and citations omitted). Courts in employment cases "do not sit as a superpersonnel department" to determine whether an employer made a sound business decision by selecting one applicant over another. *Blise*, 409 F.3d at 867 (citations omitted). As explained here, Plaintiff has not produced evidence from which a reasonable factfinder could conclude that Defendant's failure to promote him to the BME positions or the remittance mail position was a product of discrimination.

### 1.     BME Positions

As a reminder, Meeks (the hiring officer) selected Burns (a Black male born in 1978) for the Bedford Park BME position and Koonce (a Black woman born in 1979) for the Carol Stream BME position. Meeks testified that she selected Burns because he had prior experience in the BME unit and performed well in the interview. (Def.'s SOF ¶ 40.) Meeks purportedly selected Koonce because she had previously supervised BME units in four Postal Service locations. (*Id*. ¶ 43.) Both Burns and Koonce received better scores on their applications than Saggu (Def.'s SOF ¶¶ 41, 44), but Saggu believes that Meeks gave them higher scores because she is also Black. (Pl.'s Resp. to Def.'s SOF ¶¶ 40, 42; Pl.'s SOF ¶¶ 22, 23.). Aside from this personal belief, Saggu has not provided direct or circumstantial evidence that Meeks overlooked him *because of* his race, sex, national origin, religion, or age. Instead, he argues that Meeks's stated reasons for selecting Burns and Koonce were pretextual. (Pl.'s Opp'n at 22–23.)

Meeks had personal familiarity with Saggu's work: she testified that he did not perform well when she supervised him on a detail to the BME unit. (Def.'s SOF ¶ 36.) Meeks also testified that Saggu did not demonstrate knowledge of the goals of the BME unit during his interview and did not seem prepared. (*Id*. ¶ 45.) Saggu clearly disagrees with Meeks's assessment of his

27

interview, but he offers no evidence that Meeks did not honestly believe her stated reasons for preferring Burns and Koonce. *See Blise*, 409 F.3d at 867. Saggu's argument for pretext boils down to his personal belief that he was the superior candidate. But again, "[a]n employee's own opinions about [his] . . . qualifications [do not] give rise to a material factual dispute." *Robertson*, 949 F.3d at 381 (internal quotation marks and citations omitted). Without more, Saggu cannot demonstrate that Defendant's reasons for selecting Burns and Koonce were lies.

### 2. Remittance Mail Position

Similarly, Plaintiff has not provided direct or circumstantial evidence that the hiring manager for the remittance mail position (Mayberry) discriminated against him on the basis of his race, sex, national origin, religion, or age. Mayberry selected Davis (a male of unspecified race born in 1959 who had previously filed EEO complaints) ostensibly because of Davis's experience with customer service and his favorable performance on a detail to the remittance mail unit. (*Id*. ¶¶ 66, 72.) As with the BME positions, Plaintiff asserts that Mayberry's stated reasons for selecting Davis were pretextual. His only evidence of Mayberry's possible favoritism for Davis is that Saggu once heard Mayberry say, "You got it, man" to Davis. (*Id*. ¶ 68.)

As a threshold matter, it is noteworthy that Davis shares several of Saggu's protected characteristics: both are male, both were born in 1959, and both had filed EEO complaints. There is also no evidence in the record as to Davis's race, national origin, or religion. Accordingly, it is unclear how Mayberry's selection of Davis could be evidence of discrimination on the bases of race, sex, religion, national origin, or age. Setting that aside, Saggu has not offered evidence that Mayberry's stated reasons for selecting Davis were lies. Instead, Plaintiff finds it suspicious that Mayberry told Saggu in March 2018 that the positions were not available for lateral transfers, but then offered Davis the remittance mail position as a lateral transfer. (Pl.'s Opp'n at 25.) Defendant has explained, however, that Mayberry's statement was true at the time: there was a temporary moratorium on lateral transfers beginning in January of 2018, and Davis's transfer did not receive

28

approval until May 2018, when transfers were allowed again.  (*See* Def.'s Resp. to Pl.'s SOF ¶ 35.)

* * *

More generally, Plaintiff argues that a reasonable person "could certainly find that the differences between other candidates and Plaintiff were so favorable to Plaintiff that he should have been promoted over them."  (Pl.'s Opp'n at 21.)  This argument misstates the relevant inquiry for pretext: the question is not whether reasonable minds *could find* Plaintiff more deserving of these positions, but whether his qualifications were "so favorable . . . that there can be *no dispute* among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue."  *Robertson*, 949 F.3d at 381 (emphasis in original, citations omitted). Because Plaintiff has not produced evidence that meets that standard, the court grants summary judgment to Defendant on the claims for discrimination under Title VII and the ADEA.

## II.     Retaliation

Title VII and the ADEA prohibit an employer from discriminating against its employees because an employee complained of discrimination by, for example, filing a charge with the Equal Employment Opportunity Commission ("EEOC").  42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d). To survive summary judgment on a retaliation claim under Title VII or the ADEA, a plaintiff "must produce enough evidence for a reasonable jury to conclude that (1) [he] engaged in a statutorily protected activity; (2) the [employer] took a materially adverse action against [him]; and (3) there existed a but-for causal connection between the two."  *Robertson*, 949 F.3d at 378 (citations omitted); *see also Boston v. U.S. Steel Corp.*, 816 F.3d 455, 464 (applying the same test in the ADEA context).  The *McDonnell Douglas* burden-shifting framework also applies in the retaliation context.  *See, e.g.*, *Boss*, 816 F.3d at 918.  Considering the evidence as a whole, courts ask: "Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that

29

retaliatory motive caused the [materially adverse action]?"  *Abrego*, 907 F.3d at 1014 (internal quotation marks omitted, alteration in original).

Defendant does not dispute that Plaintiff engaged in statutorily protected activity: Saggu filed EEO complaints about Binkley after she denied him leave to visit his mother in India.  (Def.'s SOF ¶ 76.)  Instead, Defendant disputes whether he suffered materially adverse actions and whether there was a causal connection between the two.

### A.    Adverse Actions

The bar for what qualifies as an adverse action in the retaliation context is lower than in the discrimination context.  A plaintiff merely needs to show that the employer's actions could have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Boss*, 816 F.3d at 918.  But "Title VII does not set forth a general civility code for the American workplace, [and] its anti-retaliation provision does not protect against petty slights, minor annoyances, and bad manners."  *Id*.

Most of the incidents discussed above do not qualify as adverse actions because they would not dissuade a reasonable worker from reporting discrimination.  This includes Binkley's initial denials of leave requests, her alleged micromanagement of Saggu, occasional criticism that Saggu was not doing his job, and threatening to write him up.  *See Boss*, 816 F.3d at 919 ("Unfair reprimands or negative performance reviews, unaccompanied by tangible job consequences, do not suffice [for retaliation liability].").  It also includes Binkley's assignment of more units for Saggu to supervise, her alleged denial of lunch breaks, denial of unspecified training, and failure to invite Saggu to apply for acting manager of distribution operations.  *See id*. at 918–19 ("An employee must suffer something more disruptive than a mere inconvenience or an alteration of job responsibilities.") (citation and internal quotation marks omitted).  Denials of purely lateral transfers also do not qualify as adverse employment actions in the retaliation context.  *See Dandy*,

388 F.3d at 275.  That leaves Saggu's failure to promote claims for the BME positions and the remittance mail position as the only actions that may have been materially adverse.

### B.      Causation

In the retaliation context, an employee can establish causation with circumstantial evidence, such as "suspicious timing, a pretextual explanation for the termination [or adverse action], and evidence that similarly situated employees were treated differently."  *Abrego*, 907 F.3d at 1015.  But suspicious timing alone is not enough to survive summary judgment.  *See id*. (citing *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011)); *Boss*, 816 F.3d at 918 ("A causal link requires more than the mere fact that an employer's action happens after an employee's protected activity.").  Nor is a plaintiff's own belief or speculation that an action was retaliatory.  *See Formella v. Brennan*, 817 F.3d 503, 516 (7th Cir. 2016) (concluding that Postal Service employee failed to present any direct or circumstantial evidence that filing an EEO complaint caused the alleged retaliation); *Brown*, 700 F.3d at 1108 ("[Plaintiff] must produce evidence that a retaliatory motive *actually* influenced the decision-maker, not merely that it *could* have.").

Plaintiff has offered little more than suspicious timing and his own belief to support his retaliation claims.  His only evidence that Binkley responded negatively to his EEO complaints is her alleged statement sometime in 2018: "Saggu, why you and Freddy are giving me [a] hard time?"  (Def.'s SOF ¶ 24.)  The conversation apparently ended after she made this statement, and there is no additional evidence suggesting that Binkley was referring to Saggu's protected activity.  There is also no evidence that Meeks, the hiring manager for the BME positions, was aware of Saggu's protected activity, much less that her reasons for not selecting Saggu were pretexts for retaliation on Binkley's behalf.

Similarly, Plaintiff's only evidence that Mayberry may have retaliated against him by not selecting him for the remittance mail position is Mayberry's alleged statement: "Why are you giving

Bernadette [Binkley] a hard time?" (Def.'s SOF ¶ 71.) Once again, it is unclear from the record when Mayberry made this statement, and he did not mention Saggu's EEO complaints during the conversation. (*Id.*) Saggu's attempt to connect this statement in isolation with his protected activity is tenuous, particularly in light of the fact that, as Plaintiff concedes, many people in the office knew that he and Binkley had a poor working relationship. (*Id.*) Without more, the court cannot conclude that Mayberry denied Saggu the promotion because of his protected activity.

## III.    Hostile Work Environment

Title VII protects employees from hostile work environments that are "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Abrego*, 907 F.3d at 1015 (citations omitted) (Title VII); *see also Tyburski*, 964 F.3d at 600-01 (noting that the Seventh Circuit has assumed but never decided that plaintiffs may bring hostile work environment claims under the ADEA). To survive summary judgment on a hostile work environment claim, a plaintiff must show that "(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Abrego*, 907 F.3d at 1015.

In Plaintiff's response brief, he seems to focus on race and sex discrimination by Binkley that contributed to an allegedly hostile work environment. (*See* Pl.'s Opp'n at 16.) Later, however, he points to Binkley's denial of leave for a religious holiday as evidence of religious discrimination, suggesting that he has not withdrawn his claims for other forms of discrimination. (*Id.* at 17.) Regardless of the type of discrimination Plaintiff is alleging, Binkley's actions, even when viewed together, do not amount to a hostile work environment. *See Ngeunjuntr v. Metro Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir. 1998) ("[R]elatively isolated instances of nonsevere misconduct will not support a claim of a hostile work environment."). Specifically, her three comments that Saggu

was not doing his job, whether or not they occurred in front of other employees, do not rise to the level of severe or pervasive conduct to create a hostile work environment. While her comments may have been subjectively offensive to Saggu, they were not objectively offensive, and there is no evidence (aside from Plaintiff's own speculation in his deposition) that the comments were tied to his protected characteristics. Binkley's other alleged slights against Saggu (denying his initial requests for leave, threatening to write him up, giving him harder work assignments, denying him lunch breaks, and so on), while numerous, were not severe or pervasive. *See, e.g.*, *Abrego*, 907 F.3d at 1015–16 (affirming summary judgment on hostile work environment claim where supervisors were allegedly short tempered, unfairly critical, and disrespectful, and subjected employee to "excessive monitoring"). In sum, Plaintiff has not established that Binkley made his workplace objectively offensive with conduct that was pervasive or severe, and he has not presented sufficient evidence that would permit a reasonable jury to find that the harassment was retaliatory or otherwise due to his protected characteristics. The court therefore grants summary judgment on his hostile work environment claim.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment [28] is granted.

ENTER:

Dated: March 26, 2021

_____
REBECCA R. PALLMEYER
United States District Judge

33